**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| **JOHN DOE,** | |
| *Plaintiff,* | **Case No. 1:21-cv-2903** |
| **v.** | |
| | <u>**COMPLAINT**</u> |
| **THE TRUSTEES OF INDIANA UNIVERSITY, INDIANA UNIVERSITY BLOOMINGTON, LAUREN ROBEL, KATHY ADAMS RIESTER, and LIBBY SPOTTS,** | **JURY TRIAL DEMANDED** |
| *Defendants.* | |

Plaintiff John Doe ("Plaintiff" or "Doe"), by his attorneys Nesenoff & Miltenberg, LLP and Saeed & Little, LLP, respectfully alleges against the Trustees of Indiana University, Indiana University Bloomington, Lauren Robel, Kathy Adams Riester and Libby Spotts (collectively, "Defendants"), as follows:

<u>**THE NATURE OF THIS ACTION**</u>

1.      Indiana University Bloomington purports to recognize its responsibility to "support and uphold the basic freedoms and citizenship rights of all students."

2.      In direct contrast to this recognition, the Defendants subjected Doe to a rushed process that lacked such recognition and took away the basic freedoms and rights it promised to him as a student of the University.

3.       Having completed the coursework for his junior year and with only finals remaining, Doe was issued a one-year summary suspension, affecting three semesters, without a hearing, for a 40-50 person gathering that occurred at his off-campus residence that he shared with four other students on April 23, 2021.

4.      The Plaintiff was improperly held to a higher standard because of his elected position as President of his fraternity.

5.      Three of the other co-lessees of the premises who were equally involved in co-hosting the social gathering, all of similar age and in the same year of matriculation as Plaintiff, were given much lesser penalties and were not at all impeded from completing their studies.

6.      One of the lesser sanctioned individuals held the position of Standards Chair, responsible for upholding the rules, integrity and reputation of the Fraternity Chapter. Despite holding this high elected position, this individual was not sanctioned as harshly as the Plaintiff and was allowed to continue with his education uninterrupted.

7.      To justify the excessive sanction, the Defendants asserted that the gathering did not comply with Covid-19 directives set forth in the Monroe County Health Department Order, City of Bloomington Executive Order and the University Student Commitment Form.

8.      Yet, there was no contention that anyone at the gathering had or transmitted Covid-19. Plaintiff and his fellow fraternity brothers were subjected to heightened Covid-19 testing throughout the 2020-2021 semester and Plaintiff tested negative within a week of the alleged violation.

9.      By the end of April 2021, many of the students, including the Plaintiff, already received at least one dose of the vaccination. There was no uptick in Covid-19 cases following the gathering and transmission levels in the State, County and at the University in late April 2021 were continually decreasing and remained extremely low.

10.     There was such a low incidence rate of Covid-19 that Monroe County loosened the restriction on gatherings in February 2021, two months prior to the alleged incident, allowing

private gatherings of up to fifty (50) people at private residences. The February 2021 County regulations did not expressly refer to Fraternity and Sorority off-campus housing.

11.     On April 6, 2021, Governor Eric J. Holcomb delivered a Statewide address and lifted all restrictions on gatherings and the wearing of masks for the entire State in accordance with CDC guidelines.

12.     Following the Governor's Order, Monroe County issued a Public Health Regulation on April 7, 2021, advising that gatherings at personal residences within the County would continue to be limited to fifty (50) people, and expressly referenced a 50-person limit for gatherings at personal residences, including fraternities and sororities on or off the Indiana University campus in the City of Bloomington.

13.     The City of Bloomington did not issue any advisory opinion or instructions following Governor Holcomb's April 6, 2021 Order or the County's April 7, 2021 Public Health Regulation, to advise students of further limitations on gatherings at off-campus premises or whether the previous City rules were effective in light of the changes to the State and County regulations.

14.     The University, in summarily suspending the Plaintiff, misstated the State's and County's restrictions on gatherings at the time.

15.     Moreover, within a few weeks of this alleged violation and prior to the issuance of the decision on Doe's appeal, all Covid-19 restrictions in Monroe County, the City of Bloomington and the University were entirely lifted, including restrictions on gatherings and mask mandates, clearly rendering the three-semester suspension grossly overreactive and unnecessary.

16.     The rushed summary one-year suspension and the refusal to permit John Doe to complete the Spring 2021 semester are particularly egregious in light of the eased Statewide and

County restrictions, which expressly allowed up to fifty (50) people for an off-campus fraternity gathering, and the fact that the College permitted three other similarly situated students who co-hosted and participated in the outdoor gathering of approximately 40-50 people at their off-campus house, to complete their courses remotely during the semester in which the violation occurred, without impact to their continued education.

17.     Plaintiff timely requested and was granted a formal hearing, wherein he argued one of the two grounds for consideration "allowed" by Indiana University Bloomington's Code of Student Rights, Responsibilities, and Conduct (the "Code"), that the summary suspension was inappropriate given the facts and circumstances.

18.     Despite this being one of the permitted grounds by which to seek relief, the hearing panel was given no power or authority within the Code to recommend a reversal of the suspension or a lesser sanction if it found that the decision to suspend was inappropriate.

19.     Therefore, the hearing is simply a mirage and fails to offer students, including the Plaintiff, due process protections as required by law.

20.     As a result of Defendants wrongful conduct, Plaintiff will now be delayed in his education by three semesters, thereby delaying his entry into the workforce, impacting his ability to earn an income, and adversely affecting his future educational and career opportunities.

21.     Accordingly, Plaintiff brings this action for violations of 42 U.S.C § 1983 (Denial of Fourteenth Amendment Due Process), together with any and all claims which can be reasonably inferred from the facts as set forth herein.

## THE PARTIES

22.     Plaintiff John Doe is a natural person, citizen of the United States, and resident of the State of California. Doe matriculated at Indiana University Bloomington in the Fall of 2018, with an anticipated graduation date of Spring 2022 prior to the suspension.

23.     During the events described herein, Doe was enrolled as a full-time student at Indiana University Bloomington.

24.     Defendant Trustees of Indiana University is the legal name of the public educational institution under the laws of the State of Indiana. Upon information and belief, the Trustees of Indiana University govern several colleges under its parent umbrella of Indiana University.

25.     Defendant Indiana University Bloomington is a public research university in Indiana and is part of the Indiana University system.

26.     Indiana University Bloomington is located in the City of Bloomington, Monroe County.

27.     Defendant Lauren Robel was the Provost and Executive Vice President of Indiana University Bloomington, and at all times relevant to this Complaint was responsible, individually and in her official capacity, to ensure that Indiana University complies with applicable due process laws.

28.     Upon information and belief, Defendant Lauren Robel is a resident of Indiana.

29.     Defendant Kathy Adams Riester was the Associate Vice Provost for Student Affairs/Executive Associate Dean of Students, and at all times relevant to this Complaint was responsible, individually and in her official capacity, for ensuring that Indiana University complies with applicable due process laws.

30.     Upon information and belief, Defendant Kathy Adams Riester is a resident of Indiana.

31.     Defendant Libby Spotts was the Associate Dean of Students and Director of the Office of Student Conduct, and at all times relevant to this Complaint was responsible, individually and in her official capacity, for ensuring that Indiana University complies with applicable due process laws.

32.     Upon information and belief, Defendant Libby Spotts is a resident of Indiana.

## JURISDICTION AND VENUE

33.     This Court has federal question, diversity, and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1367 because: (i) the federal law claim arises under the constitution and statutes of the United States; (ii) Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000; and (iii) the state law claims are so closely related to the federal law claim as to form the same case or controversy under Article III of the United States Constitution.

34.     This Court has personal jurisdiction over Defendant Trustees of Indiana University on the ground that it is conducting business within the State of Indiana.

35.     This Court has personal jurisdiction over Defendant Indiana University Bloomington on the grounds that it is conducting business within the State of Indiana.

36.     This Court has personal jurisdiction over Defendants Lauren Robel, Kathy Adams Riester, and Libby Spotts as they reside in the State of Indiana.

37.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

I.       **Plaintiff Doe's Background**

38.     At the time of this incident, Doe was a 21-year-old Junior at Indiana University Bloomington, with only one week of finals standing between his advancement to his senior and final year when he was summarily suspended without a hearing.

39.     Prior to entering Indiana University Bloomington, Doe was a very accomplished high school student, having achieved Honor Roll status and earning 30-college credits in his Junior and Senior years. He also participated in various extracurricular activities, including Varsity Track and Field.

40.     At Indiana University Bloomington, Doe immediately immersed himself in the community.

41.     Doe pledged Pi Lambda Phi in the Fall semester of his freshman year and was very involved in fraternity life, including philanthropic projects wherein he assisted with fundraisers to feed the large homeless population in the City of Bloomington.

42.     Doe was very well regarded in his fraternity and was elected President for the Fall 2020-Spring 2021 semester, a period like no other given the difficulties imposed by the Covid-19 pandemic. He resided off-campus, in a fraternity house known as "The Den", with four fraternity brothers during the 2020-2021 academic year.

43.     While at Indiana University Bloomington, Doe thrived academically.

44.     As a result of his academic success, Doe secured a summer internship at a big four accounting firm with an eye towards full time employment upon his graduation in Spring 2022.

45.     Doe accepted this job offer and intended to use this internship as a stepping-stone to full time employment upon his anticipated graduation at the end of the Spring semester of 2022

prior to his suspension. He has now been offered a full-time employment position, which is contingent on Doe receiving his degree in good academic standing and a background check, wherein the disciplinary sanction will most certainly be disclosed upon the firm's request for Doe's educational records.

## II.   **The Contract Between Indiana University Bloomington and the Plaintiff**

46.     Doe matriculated at Indiana University Bloomington in the Fall of 2018 due to its rigorous academic curriculum, extracurricular activities, and strong community feel, with an anticipated graduation date of Spring 2022.

47.     Upon enrollment, Indiana University Bloomington provided Plaintiff Doe copies of the Code of Student Rights, Responsibilities and Conduct, which establishes the procedures by which the College would investigate and adjudicate alleged violations of its standards.

48.     It is well settled that the relationship between a student and a college or university is contractual in nature, with the terms of the contract being established by the student handbook, circulars, bulletins, and other related policies. See Park v. Indiana University School of Dentistry, 781 F.Supp.2d 783 (7th Cir. 2011); Ross v. Creighton University, 957 F.2d 410 (7th Cir. 1992); Gordon v. Purdue University, 862 N.E.2d 1244 (Ind.Ct.App. 2007).

49.     Universities owe their students a duty of care when creating and enforcing its policies and procedures.

50.     Thus, in consideration for Plaintiff's payment of tuition and attendance, Indiana University assured Doe that he was entitled to learn in an environment that supports freedom, fundamental rights and fairness.

A.      **The 2020-2021 Code of Student Rights, Responsibilities and Conduct**

51.     The 2020-2021 Code of Student Rights, Responsibilities and Conduct ("the Code") was in effect during the relevant time period discussed in this Complaint.  See, *Code of Student Rights, Responsibilities and Conduct*, Indiana University Bloomington, https://studentcode.iu.edu.

52.     The Preamble to Part I of the Code provides "the rights and freedoms to which all students-undergraduate and graduate-are entitled at Indiana University."

53.     Included in these rights are the Pursuit of Education and the ability to learn in an environment that "supports the freedom of self-expression and association" and "the right to freedom of Association, Expression, Advocacy, and Publication," wherein it states that the university recognizes the rights of all students, in accordance with the state and federal Constitution, "to ….assemble…without university interference or fear of university disciplinary action."  *See* Code, Part I:A and I:E.

54.     The student's responsibilities section, outlined in Part II of the Code, begins by stating that "Indiana University recognizes its responsibility to support and uphold the basic freedoms and citizenship rights of all students…"  *See* Code, Part II.

55.     Part II lists rules students on campus must follow, but provides that "in addition to these on-campus responsibilities, the university may discipline a student for acts of personal misconduct or criminal acts that are not committed on university property…if the misconduct undermines the security of the university community or the integrity of the education process or poses a serious threat to self or others." *See* Id.

56.     Indiana University regards off-campus activity, including but not limited to university-sponsored events, as an integral part of a student's academic, personal, and professional

growth. Thus, the University recognizes the right of all students to expect that the University will subject individuals to the same responsibilities and disciplinary procedures when conduct:

> Presents a clear danger to the personal safety of any person or the protection of any person's property, such as alcohol and drug offenses, arson, battery, fraud, hazing, participation in group violence, stalking, or theft." *See* Id.

57.     When an alleged violation arises, Part III of the Code prescribes the procedures in place for resolving charges of misconduct.

58.     Part III, General Principles, provides: "the University intends that proceedings under the Student Code not only resolve charges of misconduct, but also have educational benefit for the students involved. Accordingly, every effort will be made to ensure that students are encouraged to speak for themselves throughout the process of addressing alleged Code violations." *See* General Principles, Part III(1).

59.     The intentions in Part III(1) do not apply in instances where the University summarily determines that a student poses a serious and substantial risk of harm to others. *See* General Principles, Part III(6).

60.     In such instances, the Provost may summarily suspend a student without following hearing procedures if it is deemed that the student's presence on campus constitutes a serious threat of harm to other persons on the university campus. *See* Personal Misconduct – Summary Actions, Part III(B)(4).

61.     A student who is summarily suspended may request a formal hearing within ten (10) calendar days of receiving notice of the summary suspension if the student disagrees with the decision of responsibility for misconduct reached by the Provost of the campus **or** the student believes that the sanction of the summary suspension is inappropriate. *See* Personal Misconduct – Summary Actions, Part III(B)(4)(b)(1) (Emphasis added).

10

62.     However, the Code provides no mechanism to reconsider or overturn a summary suspension that is inappropriate and overreaching. *See generally*, Personal Misconduct – Summary Actions, Part III(B)(4)(b).

63.     The hearing commission may only consider whether the student committed the offense as charged. *See* Personal Misconduct – Summary Actions, Part III(B)(4)(b)(8).

64.     If the hearing commission finds that the student committed the offense, it is required to uphold the summary suspension. *See* Personal Misconduct – Summary Actions, Part III(B)(4)(b)(8).

65.     A student that admits fault but argues that the summary suspension is inappropriate given the circumstances is not offered any relief from the Code, despite this being one of the expressed grounds for a hearing. *See generally*, Personal Misconduct – Summary Actions, Part III(B)(4).

**B.      Indiana University and The Coronavirus Pandemic**

66.     The novel Coronavirus pandemic, as the Court and parties are acutely aware, greatly impacted the entire world.

67.     On March 6, 2020, Indiana Governor Eric J. Holcomb issued Executive Order 20-02, declaring a public disaster emergency as a result of the Covid-19 pandemic.

68.     In an effort to prevent the spread of the virus, on March 15, 2020, Indiana University extended spring break and shifted its learning to remote only for the remainder of the Spring 2020 semester.

69.     The University found remote learning to be sufficient to reduce any risk of spread of the Covid-19 virus, begging the question of why suspension, much less a three-semester suspension, was necessary where remote learning would have achieved the intended result.

70.     Despite the increasing spread of Covid-19 and growing criticism, Indiana University Bloomington decided to welcome students back to campus for in-person learning at the start of the 2020-2021 academic year and incorporated safety protocols that were constantly evolving, in accord with the State, County, City and CDC guidelines.

71.     Prior to the start of the Fall 2020 semester, Monroe County Health Department issued an Executive Order limiting gatherings to fifty (50) people, requiring masks both indoors and outdoors and requiring social distancing of six feet if not masked.  *See* Monroe County Health Department Public Health Order dated July 24, 2020.

72.     In anticipation of students returning for the Fall 2020 semester, on August 21, 2020, the City of Bloomington imposed a 15-person limit on social gatherings.  *See,* City of Bloomington Executive Order 20-03.

73.     In accord with the State's Executive Orders, every "in-person" student was provided with University Policies, effective August 5, 2020, and a Student Commitment Form, wherein they agreed to practice good personal hygiene, wear a face mask in public, practice physical distancing and adhere to other guidelines and requirements.

74.     Despite the Commitment agreed to by the students of Indiana University, the University could not control the off-campus gatherings that took place throughout the entire year, many of which were reported in the News.

75.     According to the Indiana University's Policies website, the Sanctions for Noncompliance with COVID-19 included a hold on accounts, fines or fees and a temporary exclusion from on-campus class attendance and physical presence on campus with a required switch to all online classes. There was no mention of suspensions on the website.

76.     To make it easier to understand the transmission rate of Covid-19 in the State of Indiana, in or around November 2020, Governor Holcomb implemented a new color-coded system and announced new social gathering limits based on a Covid-19 color metric, with limited gatherings to 25 people for counties in red (county spread is high, with a point score of 3.0 or below); 50 people for counties in orange (county spread is high, with a point score of 3.0 or below); 100 people for counties in yellow and 250 people for counties in blue (county spread is low, with a point score of .5 or below).  *See* Executive Order 20-48.

77.     Following the State's Guidelines, Monroe County issued updated regulations for Bloomington on November 17, 2020, reiterating the State's color code metric, but further restricting residential gathering size to 50 people in Blue and Yellow areas; 25 in Orange areas and restrictions to be determined in red areas.

78.     In late February 2021, Monroe County changed its color-coded status from yellow to blue following a significant decrease in positive test results for the County.

79.     On February 22, 2021, Plaintiff's fraternity Chapter at Indiana University was issued a Cease and Desist Order due to allegations that a fraternity event at an unidentified off-campus facility hosted up to 150 people over a three-day period.

80.     The Cease and Desist Order does not indicate the amount of people present at the same time at the "off-campus event" or the location of the "event."

81.     Nonetheless, the Cease and Desist Order advised the fraternity, through its President (the Plaintiff), that no more than fifteen (15) persons many gather in the City of Bloomington at one time.

82.     The Cease and Desist Order does not delineate any timeframe by which the Order was to remain effective.

83.     In compliance with the Cease and Desist Order, the fraternity did not host or hold any events between February 2021 and the April 2021.

84.     Indiana University started offering vaccinations to all students in late March 2021 and many of the students had received at least one dose of the one or two dose vaccines prior to this alleged incident.

85.     On April 6, 2021, Governor Holcomb lifted the mask mandate and social gathering limits citing a drastic drop in positivity ratings in the State of Indiana and the mass vaccination of almost a million residents.

86.     In his April 6, 2021 address, Governor Holcomb advised that although the State lifted all restrictions, smaller municipalities may impose Covid restrictions.

87.     On April 7, 2021, Monroe County Health Department issued an update and advisory stating that regardless of the changes to the State of Indiana's rules or regulations, Monroe County will continue to follow the previous color code metric.

88.     In its April 7, 2021 update, Monroe County Health Department continued to limit gathering sizes of all non-commercial gatherings to fifty (50) people and expressly stated that the 50-person limit applied to private gatherings held at personal residences, "including fraternities and sororities located in the City of Bloomington and on or off the Indiana University campus."

89.     Monroe County Health Department further advised on April 7, 2021, fully vaccinated persons may follow the CDC guidelines with regard to masking and social distancing.

90.     In its April 12, 2021 update, the City of Bloomington noted the confusion of the Covid rules and regulations in the State of Indiana and Mayor John Hamilton's office, in its weekly update, advised that the mask mandate applies but did not address gathering size.  *See*, COVID Update to Community on April 12, 2021 | City of Bloomington, Indiana.

91.     As there were no updates from the City of Bloomington as to gathering size, and Monroe County expressly limited the gathering size at fraternity off-campus housing to fifty (50) people in its April 7, 2021 update, it was believed that the County's restrictions applied.

92.     On May 17, 2021, both Monroe County and the City of Bloomington rescinded all Covid restrictions, citing to the same CDC guidelines that the State relied on when Governor Holcomb rescinded Covid restriction for the State on April 6, 2021.

93.     On July 6, 2021, Indiana University released its health and safety guidance for the upcoming semester, wherein it advised that all Covid restrictions would be lifted for the Fall 2021 semester.

94.     The July 6, 2021 Indiana University guidelines mandate Covid-19 vaccinations for all students, faculty and staff for the Fall 2021 semester.

95.     On July 19, 2021, a federal judge rejected a request by students to block Indiana University's vaccine mandate requirement. The U.S. Court of Appeals for the Seventh Circuit upheld the decision.

**III.     The Alleged Incident of April 23, 2021**

96.     The Little 500, an intramural relay-style bicycle race held annually at Indiana University, was scheduled for April 22-23, 2021.

97.      The Little 500 is well known nationally as the biggest party weekend for Indiana University.

98.     While the event was postponed to try and prevent massive crowds from gathering, the parties associated with the event still went forward all over the Bloomington area.

99.     In fact, the Intra Fraternity Council President, who serves as the liaison between Indiana University and its fraternities, held a telephone conference with all fraternity presidents

before the weekend started, wherein he acknowledged the parties that were planned by every fraternity that weekend, and advised everyone to be safe.

100.    The Plaintiff and his four housemates, also members of his fraternity, hosted a social gathering in their private off-campus residence that weekend.

101.    The social gathering was not advertised as a university event.

102.    The outdoor social gathering did not exceed fifty (50) people at any given time and did not extend indoors.

103.    The number of people attending the outdoor gathering was within Monroe County Health Department's guidelines, as stated on April 7, 2021.

104.    Given the expressly stated County regulations for gatherings at off-campus fraternity residences, it was unclear whether the City of Bloomington's former restrictions were still in effect.

105.    Although Plaintiff resided in an off-campus house, the Indiana University Police Department responded to a report of a "large party and noise complaint" coming from the Plaintiff's residence.

106.    The Officers reported that they could hear music from a couple of blocks away and confirmed that the music was from the subject off-campus residence.

107.    The Officers, after entering the home without a warrant, observed between 40-50 people in the backyard of the subject residence and it was claimed that none of the individuals were wearing masks or social distancing.

108.    It was noted that the Bloomington Police Department earlier responded to the residence because of a loud music complaint.

109.    The Bloomington Police Department did not request that the gathering be shut down, nor did it cite the residents of the subject premises for any violations.

110.    When the Indiana University Police Officers later responded, they identified and spoke with four of the five residents of the house, all students of Indiana University, including the Plaintiff.

111.    The four residents, including the Plaintiff, were very cooperative and agreed to keep the music down and terminate the gathering.

### IV.    Indiana University Conducts a Rushed Investigation and Issues a Summary Suspension without a Hearing

112.    On Tuesday, April 27, 2021, Plaintiff received a letter from the Associate Vice Provost for Student Affairs/Executive Associate Dean of Students, Kathy Adams Riester, advising that he was summarily suspended for a full year without a hearing because his "behavior" was considered dangerous and disruptive to the university community and constituted a serious threat of harm to himself and others on campus.

113.    The suspension affected three semesters as it was issued just before Spring 2021 semester finals.

114.    In outlining the "behavior" that purportedly warranted this sanction, it is clear that the University was holding Plaintiff to a higher standard than the other three students that co-hosted the social event, who were only banned from campus without any sanctions imposed against their continued studies, simply because of his elected position as President of Pi Lambda Phi.

115.    In an effort to justify its unfair finding and disproportionate sanction, the University improperly increased the number of attendees at the residence to "40-100" individuals "throughout the course of the day", despite actual evidence of there being only 40-50 people at any given time.

116.     Contrary to Indiana University's findings, the number of people at the event was not in violation of the Monroe County Health Department's Order and it was questionable whether the City of Bloomington's earlier restrictions were still effective, given the express language in the April 7, 2021 Monroe County Health Department Order limiting social gatherings in off-campus fraternity residences to fifty (50) people.

117.     In light of the April 7, 2021 Monroe County Health Department's Order advising that fully vaccinated individuals were not required to mask or socially distance, but instead follow CDC guidelines, the University failed to ascertain whether any of the attendees to the social gathering were fully vaccinated before making a finding that the Monroe County Health Department Order was violated.

118.     Moreover, there were never any rules or regulations imposed by the State, County, City or University, limiting the amount of people that were allowed to congregate at an off-campus residence at different times during the course of a day.

119.     Given the improper application of the regulations, the recent changes in the law and the eased restrictions based on the decreasing emergency state of the pandemic, the University improperly found the Plaintiff's presence on campus to constitute a "serious threat of harm" to himself and/or others on campus.

120.     Only a few weeks after this decision, the County, City and school rescinded all Covid restrictions based on the April 6, 2021 State and CDC recommendations, further establishing that there was no serious continuing threat justifying the deprivation of Plaintiff's rights without a proper hearing.

121.     The University took part in a conference with a third-party from the Plaintiff's fraternity headquarters, without notice to the Plaintiff, wherein the purported facts of the rushed

investigation were discussed, and the University advised the fraternity headquarters of the Plaintiff's summary suspension.

122. The University's communication of the sanction to fraternity headquarters tarnished Plaintiff's reputation and led to a suspension of Doe's membership in the organization.

123. Most recently, Doe was given an opportunity for full-time employment with a big four accounting firm. Doe was advised that employment is contingent on Doe receiving his degree in good academic standing and a background check, wherein the disciplinary sanction will most certainly be disclosed upon the firm's request for Doe's educational records, further subjecting Doe to reputational harm due to the University's improper proceedings and grossly disproportionate sanction.

## V. **Indiana University Imposes Grossly Disproportionate Sanctions**

124. Defendant Riester found Plaintiff and three of his four housemates responsible (the "Finding") for violations of Part II, I. Personal Misconduct Not on University Property/I2b.

125. As a result of the Finding, Indiana University imposed a grossly disproportionate sanction upon the Plaintiff, including, most notably, a suspension of one full year, which was in actuality a one-and-a-half-year suspension as it was imposed just before Spring 2021 finals, thus compromising the Spring 2021, Fall 2021 and Spring 2022 semesters. *See* <u>Id</u>.

126. Plaintiff first learned of the violation and the summary suspension when he received a letter from Defendant Riester on April 27, 2021.

127. In the letter, Plaintiff was advised that he is required to petition the school for reinstatement after the expiration of the one-year suspension and there is no guarantee that Plaintiff will be welcomed back after the one-year suspension expires.

128. Pursuant to the Code, the suspension remains a permanent part of Plaintiff's disciplinary record and is notated on his official transcript for the term of the suspension. *See* Part III(B)(1)(h)(8).

129. As the term of Plaintiff's suspension is indefinite and may continue in perpetuity, his academic transcript may be permanently marred by this rushed and unfair sanction.

130. Plaintiff was further subjected to a loss of tuition for the Spring 2021 semester and was advised that he may be subjected to further consequences. *See* Id.

131. Plaintiff was particularly shocked by the sanctions because it was not in line with other disciplinary decisions issued by Indiana University related to Covid-19 Policy violations, as evidenced by the much lesser sanctions issued to his co-hosting housemates, and it was grossly disproportionate to the alleged violation, as it was not a University-sponsored event and the gathering was held at such a time when even the State acknowledged the low incidence of Covid transmission.

132. The sanctions are particularly egregious, considering the decisions and sanctions that the University dispensed to the three other students who co-hosted the gathering, none of which, upon information and belief, resulted in a delay in education or impact upon a graduation date, let alone a suspension for a period of three full semesters.

133. Upon information and belief, the other three individuals who co-hosted the gathering were allowed to complete their finals and continue with their studies wholly unabated.

## VI. <u>Indiana University's Formal Review of the Summary Suspension without Due Process</u>

134. The Plaintiff was advised by letter that he could request a formal review within ten (10) days. The basis for formal review was not set forth in the letter.

135.    The timing of the formal review process coincided with Spring 2021 final examinations and left Plaintiff no option but to request an immediate review without having the chance to investigate the evidence against him.

136.    At Plaintiff's request and because of impending finals, the formal review was scheduled for April 29, 2021.

137.    Plaintiff did not receive the evidence that was relied upon by the University in issuing the summary suspension until approximately 45 minutes prior to the hearing, giving him little to no time to adequately review the material or prepare for the formal review.

138.    The Plaintiff was not advised of the identities of the three hearing committee members prior to the hearing, other than the fact that the members would include one student and two faculty members.

139.    The Code provides the grounds for relief of a summary suspension.

140.    Part III(4)(b) of the Code states: "Allegations of misconduct filed against a student who has been summarily suspended will be adjudicated by a hearing commission, only if requested in writing by the student within 10 days of receiving notice of the summary suspension."

141.    Procedures to be followed by the hearing commission included the following: "(1) If the student disagrees with the decision of responsibility for misconduct reached by the Provost of the campus, **or** the student believes the sanction of summary suspension is inappropriate, the student may request a formal hearing before a hearing commission." *See* Part III(4)(b)(1) (emphasis added).

142.    The written request had to be submitted to the Dean of Students no later than ten (10) calendar days after receiving notice of the summary suspension.  *See* Part III(4)(b)(1).

143.    Relying on the Code, Plaintiff requested a formal review by the hearing commission on the grounds that the summary suspension was inappropriate given the facts and circumstances and wholly disproportionate as compared to his three similarly situated co-hosting housemates.

144.    While the formal review was granted on the appropriately sought relief, the Code provided no authority for the hearing commission to reverse, modify or recommend a modification to the sanction on these grounds.

145.    Pursuant to Part III(4)(b)(8), which directly conflicts with Part III(4)(b)(1), the hearing commission can only make a finding of whether the student committed the offense(s) as charged and if the hearing commission so finds the student committed the offense(s), it has no choice but to uphold the summary suspension decision.

146.    Given the conflict in the Code, any student who accepts responsibility, but argues that the sanction of summary suspension is inappropriate has no opportunity of success at the hearing.

147.    Therefore, the hearing is simply a sham and offers a student no protections or relief from an inappropriate sanction, in clear violation of due process and the Code.

148.    Plaintiff learned this first-hand when he sought relief on the grounds that the sanction of suspension was disproportionate and inappropriate, only to discover that the hearing commission was without any authority to overturn the Assistant Provost's decision on this ground.

149.    On April 29, 2021, the hearing commission upheld the suspension, finding that Plaintiff violated Part II, 1. Personal Misconduct Not on University Property/I2b.

150.    The hearing commission never offered any opinion as to whether the sanction was inappropriate or disproportionate, despite this being offered by the Code and being the only relief sought by the Plaintiff.

151.    By failing to grant authority to the hearing commission to determine whether a summary sanction is appropriate, the University allowed the Assistant Provost to act as judge, jury and executioner without any hearing or oversight, in clear violation of Plaintiff's rights to due process and procedural fairness, as promised by the Code. *See* Part III(4)(b)(II).

152.    In addition to due process rights and procedural fairness, Part III(4)(b)(II) of the Code further ensures equal protection for all students, and to provide for the imposition of similar sanctions for similar acts of misconduct.

153.    Not only did the University fail to provide due process and fundamental fairness rights to the Plaintiff, but it also breached its promise as delineated in the Code when it imposed an extreme and clearly harsher sanction to Plaintiff in comparison to the other three students who co-hosted the social gathering.

**VII.    Indiana University Denies Plaintiff's Appeal**

154.    The hearing commission's decision, issued by letter on April 29, 2021, advised Plaintiff of his right to appeal the decision within ten (10) days. The basis for appeal was not provided in the April 29, 2021 letter.

155.    The Code provides that if a student does not consider the recommendation from the hearing commission to be acceptable, "he or she may submit a written appeal to the Provost, explaining the reasons for not accepting the recommendation, which may include the length of time of the suspension; the Provost will consider the student's written statement prior to making a final decision."  *See*, Part III(4)(b)(13).

156.    This is the final step in the appeal process for summary suspension. *See* Part III(4)(b)(14).

157.    There were no recommendations made by the hearing commission other than a finding that Plaintiff violated the Code.

158.    Plaintiff timely submitted his appeal on May 5, 2021, once again requesting relief based on the ground that the sanction was grossly disproportionate to the facts and evidence presented.

159.    In the letter, he requested a modification of the sanction, offering that the other students who participated in hosting the gathering received a much lesser sanction of campus ban for the remainder of the Spring 2021 semester, but were permitted to complete the Spring 2021 semester remotely.

160.    With only three exams remaining in the semester, Plaintiff requested that the Provost modify the sanction to permit him to take the final three exams virtually from his home in California and complete the Spring 2021 semester.

161.    This proposed modified sanction that Plaintiff was willing to accept was no different than the sanction given to the other three students that co-hosted the gathering and posed no threat to the Indiana University community.

162.    Plaintiff further pointed out that he was no longer associated with the fraternity, a fact already known to the University, and that the dissociation further demonstrated the absence of risk to the Indiana University community.

163.    Despite the showing that the sanctions were grossly disproportionate to those handed to his co-hosting housemates and the absence of any threat to the University community, the Provost on May 17, 2021 once again failed to appreciate the Code's permission of reconsideration on such grounds, and instead agreed with the hearing commission's finding,

concluding that "the conduct on which the suspension was based was more likely than not to have occurred."

164.    It should be noted that this decision was made on the day that all Covid-19 restrictions were lifted by Monroe County Health Department, the City of Bloomington and by the University.

165.    The plan to lift all restrictions was announced a few days before the effective date of May 17, 2021, and the University was therefore on notice of the rescission when it continued to erroneously find the Plaintiff to be a "serious threat" to the campus community.

166.    Plaintiff has now exhausted all avenues for relief from the inappropriate, disproportionate, and unfair sanction.

VIII.   **Plaintiffs' Injuries**

167.    Plaintiff has already suffered and will continue to suffer significant damages as a result of the University's finding of responsibility and imposition of one-year suspension just prior to Spring 2021 finals.

168.    Although he was summarily suspended just before finals, he was able to access his classes remotely and complete finals while his appeal was pending.

169.    Plaintiff was given his unofficial final grades for the Spring 2021 semester, but the grades were later changed to incomplete because of the imposed sanction.

170.    The grossly disproportionate sanction will cause Plaintiff to lose three full semesters and delay his graduation by at least eighteen (18) months, if not longer.

171.    But for the University's unwarranted sanctions imposed upon Plaintiff, he was on track to graduate in May of 2022.

172.    Doe was recently offered full-time employment with a big four accounting firm upon his pre-sanction anticipated graduation in Spring 2022, but because of the unwarranted sanction, he has no choice but to turn down the offer. The unwarranted and extreme sanction has prevented Doe from entering the work force in the Spring of 2022 as anticipated, resulting in lost earnings for a period of more than one year. Moreover, as the offer of employment is contingent upon a background investigation, whjch will inevitably disclose the disciplinary sanction, it is unclear whether Doe will have the opportunity for such employment at a later point if this disproportionate and unwarranted sanction remains on his record.

173.    Doe will further suffer significant damages as a result of the permanent disciplinary notation and academic records, and the potential disclosure to all potential graduate schools, professional examining boards and employers.

174.    Upon information and belief, the vast majority of colleges and universities have transfer and admission policies that forbid the acceptance of students who have been suspended or expelled for misconduct.

175.    Upon information and belief, expungement is the only method to remove this sanction from his disciplinary and academic records.

176.    As a result of Indiana University's rushed investigation and lack of due process, resulting in an extreme and unwarranted decision to suspend Plaintiff, Doe has suffered and will continue to suffer severe financial distress, emotional distress and anxiety.

177.    Plaintiff is deprived of the value of the financial resources invested in his Indiana University education and most likely lost the benefit of the scholarships and financial aid he received to support his educational pursuits.

178.     Moreover, by marring his disciplinary and academic records with this sanction and tarnishing what he once hoped to be his prestigious Indiana University degree, Plaintiff will experience severe reputational damage for years to come.

179.     In addition to the loss of employment, Plaintiff was further damaged when the University engaged in discussions with a third-party (his fraternity's headquarters), without his knowledge or consent, to discuss what they believed were violations of the Code and the summary sanction imposed absent a hearing.

180.     Relying on this information the fraternity indefinitely suspended Plaintiff as a member, barring any chance for Plaintiff to seek employment through his affiliation with the fraternity, which is the avenue through which many fraternity members seek employment.

**COUNT I**
**Violation of 42 U.S.C. § 1983**
**(Denial of Fourteenth Amendment Due Process)**

181.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

182.     The Due Process Clause of the United States Constitution is implicated by Indiana University's policies and disciplinary decisions.

183.     The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

184.     A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

185.     In this case, Defendants are state actors subject to the Fourteenth Amendment.

186.     Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any

citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

187.   Plaintiff is entitled to and relied upon the promises contained in Indiana University's Code, to honor his due process rights under the United States Constitution.

188.   Pursuant to the rights guaranteed by the United States Constitution and by the Code, Doe was entitled to adequate notice, a meaningful opportunity to be heard, and a process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he faced.

189.   Plaintiff's constitutionally protected property and liberty interests in his continued enrollment and to be free from arbitrary dismissal arises from the policies, courses of conduct, practices and understandings established by Indiana University.

190.   Plaintiff's constitutionally protected property and liberty interests further arises from the express and implied contractual relationship between Indiana University and Plaintiff.

191.   Indiana University's Code provides that students are to have a fair and impartial disciplinary process in which it is the responsibility of the University to show that a violation has occurred before any sanctions are imposed.

192.   Defendant Indiana University breached its contract with Doe when it failed to provide Plaintiff with a proper hearing; failed to treat Plaintiff the same as other students for similar acts of misconduct; and, failed to provide a mechanism by which an inappropriate sanction could be modified, all of which are expressly guaranteed by the Code. *See generally,* Part III – Disciplinary Procedures.

193.   At no time was Doe afforded the procedural guarantees that are expressly promised in the Code, including the right to be treated the same as other students similarly situated and the

28

right to seek relief from an inappropriate summary sanction. Thus, Defendants violated the contract with Doe when they failed to afford him a fair and proper hearing and treated him differently from other similarly situated students.

194. Indiana University, as a public institution established by the State of Indiana, as well as the individual Defendants, as agents of the University and individually, have a duty to provide students with due process of law by and through any and all policies and procedures set forth by the University.

195. The individual defendants are liable for the relief sought herein because the Supreme Court's *Ex parte Young* decision instructs that Eleventh Amendment immunity does not bar a plaintiff's request for prospective injunctive relief or declaratory judgment against a state actor named in their official capacity. *See generally* Ex parte Young, 209 U.S. 123, 150-156 (1908). See also Green v. Mansour, 474 U.S. 64 (1985) (determining declaratory relief is within Ex parte Young's purview when violations of federal law are threatened or ongoing).

196. Plaintiff is requesting injunctive relief as he seeks to enjoin Indiana University's prohibition against his continued enrollment for no less than one-year (affecting three semesters) and the irreparable damage to his future educational and employment opportunities detailed below.

197. Plaintiff also seeks to hold the individual defendants liable in their "individual capacity" because the individual defendants knew or had reason to know at the time of Doe's proceeding that their actions violated the Fourteenth Amendment and the University's Code.

198. Defendants punished Plaintiff under a process that failed to satisfy the minimum standards of fairness required by the Due Process Clause of the Fourteenth Amendment and the University's Code.

199. Contrary to his due process rights, Indiana University suspended Plaintiff

immediately, just before finals, without inquiry as to the appropriateness of a suspension.

200.    Moreover, Indiana University provided Plaintiff with no opportunity to advocate for a more measured sanction, one that was afforded to other co-hosting students and would have allowed him to continue his studies off-campus or online to minimize the adverse impact of the suspension.

201.    Plaintiff was essentially indicted and punished before he was even given an opportunity to deny the allegations and/or argue for interim sanctions.

202.    The Defendants unlawfully deprived Plaintiff of a proper hearing by making an unjustified determination that Doe presented a severe ongoing threat to the Indiana University community, where realistically no such ongoing threat existed.

203.    Indiana University failed to conduct any meaningful investigation to evaluate whether a true and severe imminent threat of harm existed.

204.    The finding that a severe imminent threat existed was contrary to the state of the Covid-19 pandemic as it existed in the State of Indiana and Monroe County at the time of the alleged incident and therefore warranted a proper hearing, not a rushed procedure.

205.    The finding that a severe imminent threat existed is also contradicted by the lesser sanctions imposed on the other three students who co-hosted the social gathering.

206.    The formal review offered to Plaintiff after a summary suspension was issued failed to provide any basis for the relief allowed under the Code.

207.    The Code, which allowed for a hearing to determine the appropriateness of the sanction, failed to provide a mechanism by which the hearing commission could overturn or modify overzealous and inappropriate sanctions issued in absence of a hearing.

208.    Without the authority to modify a summary sanction, the formal review was simply

a sham hearing and failed to offer Plaintiff the protections afforded by the Fourteenth Amendment and by Indiana University's Code.

209.    Indiana University's failure to notify Plaintiff of the allegations before summarily suspending him, for what equates to three semesters, and subjecting him to a sham proceeding which denied a fair formal review of the allegations and adequacy of the sanctions, certainly violates due process. *See* <u>Doe v. Purdue</u>, 928 F.3d 652 (7th Cir. 2019) ("To satisfy the Due Process Clause, 'a hearing must be a real one, not a sham or pretense.'" quoting, <u>Dietchweiler by Dietchweiler v. Lucas</u>, 827 F.3d 622, 629 (7th Cir. 2016)).

210.    By the same token, Indiana University issued much lesser sanctions to Plaintiff's co-hosting housemates, who were banned from campus for the remainder of the Spring 2021 semester but were allowed to complete their coursework virtually and have no ongoing disciplinary sanctions affecting the Fall 2021 to Spring 2022 semester.

211.    The modified sanctions offered to the co-hosting students prevented any possible further spread of the Covid-19 virus and sufficiently thwarted any further threat to the campus community.

212.    Indiana University violated Doe's due process rights by employing its summary suspension policy against Plaintiff without providing any mechanism, not even one that is discretionary, to mitigate the harm by offering alternative coursework during the exclusionary period.

213.    In short, after receiving notice of an alleged violation of the Covid-19 regulations against Plaintiff, Indiana University wrongfully (i) failed to notify Plaintiff of the alleged violations; (ii) sanctioned him by summary suspension prior to providing formal notice; (iii) charged him with misconduct; (iv) presumed him guilty; (v) found him guilty and imposed a

disproportionate sanction to three other students who co-hosted the social gathering; and (vi) did not provide him with any hearing or oversight to review the fairness of the sanctions.

### (i) *Indiana University Violated Doe's Protected Property Right*

214.    Prior to his suspension, Plaintiff was in good standing at Indiana University.

215.    The actions of Indiana University deprived Plaintiff of a property right when it disclosed information of the purported allegations and summary suspension to his fraternity headquarters (a third-party), without Plaintiff's consent, causing Doe to be indefinitely suspended from the fraternity and depriving him of all benefits related to his membership in the fraternity, including future employment opportunities.

216.    As a result of the University's public dissemination of this information, Doe can no longer seek employment opportunities through the contacts and affiliation he had with Pi Lambda Phi.

217.    The summary suspension further deprived Plaintiff of his continued education. At the time of the suspension, Doe was about to complete his third year and had one year remaining until graduation.  The suspension will set him back by at least eighteen months, if not longer.

218.    As a result of the suspension, Plaintiff is losing the finances he used to pay for the Spring 2021 semester and will lose the benefit and scholarships, including a Dean's Scholarship, he was afforded in the previous semesters.

219.    The summary suspension will prevent Plaintiff from accepting the full-time employment offered by the big four accounting firm where he interned this past summer as full-time employment requires a rigorous application process and Doe will be compelled to disclose the suspension and the grounds upon which the suspension was based.

220.    As Doe will be required to authorize Indiana University to disclose the disciplinary

proceedings and finding in order to apply for the full-time position, the disclosure makes it virtually impossible for Doe to obtain the coveted full-time employment position with his current employer, as well as employment with other potential employers.

221.    The obligation to authorize the disclosure of the proceedings to satisfy the requirements of the offered full-time position satisfies the stigma-plus test required to establish a violation of due process, as such disclosure is compelled and certain. *See*, Doe v. Purdue University, 928 F.3d 652 (7th Cir. 2019).

### *(ii) Indiana University Violated Doe's Protected Liberty Interest*

222.    This Court has found that "liberty interests are impinged when someone's 'good name, reputation, honor or integrity [are] called into question in a manner that makes it virtually impossible for ... [him] to find new employment in his chosen field.'" *See*, Doe v. Purdue, 928 F. 3d 652, 661 (7th Cir. 2019) *quoting* Townsend v. Vallas, 256 3d 661, 670 (7th Cir. 2001).

223.    Plaintiff's constitutionally protected liberty interest in his right to continued enrollment at Indiana University arises from the Constitution and from Indiana University's Code.

224.    Indiana University divested Plaintiff of his liberty interest when the University found Plaintiff guilty of misconduct and punished him based on a procedurally flawed and inadequate process without an opportunity for a proper hearing. By summarily suspending the Plaintiff, Indiana University deprived Doe of his protected liberty interest in his good name, reputation, honor, and integrity.

225.    Because Doe has a protected liberty interest in pursuing his education, as well as in future educational and employment opportunities, the University cannot deprive Doe of his right to occupational liberty without providing meaningful due process.

226.    Here, Plaintiff's liberty interests were violated when the Defendants formally

determined Doe committed serious conduct violations that warranted his suspension for a minimum of an academic year because that suspension changed Doe's legal status.

227.    The summary suspension will leave an unexplained 18-month gap in his studies that will impact Plaintiff going forward unless the University credits the grades he received from the completed Spring 2021 coursework and Doe is permitted to enroll in courses for the Spring 2022 term.

228.    The unwarranted and unfair discipline imposed by Indiana University will severely and permanently damage Plaintiff's liberty interest in career prospects, graduate school and financial aid.

229.    As a direct and proximate result of the above conduct, Plaintiff sustained and will continue to suffer tremendous damages including, without limitation, loss of education, loss of the employment offer by a big four accounting firm, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

230.    As a result of the foregoing, Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and to injunctive relief from the sanction imposed in violation of the Fourteenth Amendment.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendants for violations of constitutional due process under 42 U.S.C. § 1983, an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating misconduct complaints; and judgment against Defendant Indiana University, awarding Doe damages in an amount to be determined at trial, including, without limitation, damages to physical

well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of current and future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and, all other just and appropriate relief.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Respectfully submitted,

**SAEED & LITTLE, LLP**
***Attorneys for Plaintiff John Doe***

**By: s/ *Jonathan Little***
**Jonathan Little, No. 27421-49**
**133 W. Market Street #189**
**Indianapolis, Indiana 46204**
**(317) 721-9214**
**jon@sllawfirm.com**

**NESENOFF & MILTENBERG, LLP**
***Attorneys for Plaintiff John Doe***

**By: s/ *Andrew Miltenberg***
**Andrew Miltenberg, Esq. (*PHV forthcoming*)**
**Phil A. Byler, Esq. (*PHV forthcoming*)**
**Janine L. Peress, Esq. (*PHV forthcoming*)**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
**amiltenberg@nmllplaw.com**
**pbyler@nmllplaw.com**
**jperess@nmllplaw.com**